**Affirmed and Opinion filed April 3, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00544-CR

## JOHOAN RODRIGUEZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 183rd District Court
Harris County, Texas
Trial Court Cause No. 1308110**

## O P I N I O N

In three issues, appellant Johoan Rodriguez challenges his conviction for first degree intoxication manslaughter of a peace officer. *See* Tex. Penal Code §§ 49.08, 49.09. We affirm.

### *Background*

On May 28, 2011, officers were investigating the scene of a vehicle collision that had occurred just after 11 p.m. on the 610 Loop, a freeway in Houston, Texas.

The officers had cordoned off a portion of the freeway to conduct an investigation. To do so, three officers parked their patrol cars sideways across four lanes and diverted traffic off the freeway. A fourth officer parked his car across an entrance ramp to prevent vehicles from entering that section of freeway. The officers activated the emergency lights on all four vehicles and deployed flares along the roadway to increase visibility. Meanwhile, Officers Kevin Will and Michael Hardt of the Vehicular Crimes Division of the Houston Police Department began investigating the scene.

At approximately 3:15 a.m. on May 29, the officers at the patrol car barricade observed appellant's vehicle traveling toward the barricade at a high rate of speed. Appellant appeared to be exiting the freeway but then veered past the barricade and accelerated, reaching a speed of approximately 90 miles per hour.[1] Officer Will was standing on the freeway, taking photographs of the scene, when appellant's vehicle, still traveling at the same high rate of speed,[2] struck him.[3] Officer Will was killed almost instantly.

Appellant was awake but dazed and unresponsive when officers approached his car. Police officers observed obvious signs of intoxication: appellant smelled of alcohol, staggered, had glossy eyes and a "drooped," "heavy" face, slurred his

---

[1] An officer testified:

[Appellant] cut across from the fast lane, cut across all of the freeway lanes towards the exit. However, he did not take the exit. He cut back across the painted ladder marks. There's an exit sign and another patrol car. He cut across . . . nearly striking a patrol car and the exit sign back onto 610 headed to where the other officers were. . . . After the vehicle came back onto the freeway, it . . . accelerate[d] again.

[2] One officer pursued appellant with the emergency lights and siren activated in her patrol car after appellant went past the barricade. Another officer observed the chase and testified that appellant "never slowed down."

[3] Officer Will yelled at nearby witnesses before the impact to "get out [of] the way," and the witnesses were able to avoid also being hit.

2

speech, and needed assistance to get out of the car.[4]  Additionally, appellant had opened and unopened bottles of beer in the front floorboard area of the car.  Police officers found .3 grams of cocaine in appellant's pocket.  Appellant's blood was drawn at the hospital.  The testing and analysis of appellant's blood specimens revealed that, although appellant did not have cocaine in his system, his blood alcohol content (BAC) likely ranged from .20 to .24 grams of ethanol per 100 milliliters of blood at the time of the collision.[5]

After the trial court denied appellant's motion to suppress, appellant entered a guilty plea, and the jury returned a guilty verdict as instructed by the trial court.[6] At the commencement of the punishment phase of trial, appellant pleaded "not true" to a deadly weapon enhancement in the indictment.  The jury found the enhancement to be true and assessed punishment at 55 years' imprisonment.

### *Discussion*

In three issues, appellant argues (1) the trial court abused its discretion by overruling his motion for new trial without first conducting an evidentiary hearing; (2) the trial court erred in failing to admonish him of the possible deportation consequences of his plea; and (3) he received ineffective assistance of counsel.

### I.    No Abuse of Discretion in Refusing to Conduct Evidentiary Hearing

Appellant argues the trial court abused its discretion in denying his motion for new trial without first conducting an evidentiary hearing.  We review a trial

---

[4] Appellant had a large gash on his forehead but seemed otherwise unharmed.

[5] The legal limit is .08.  Appellant's BAC was .191 at the time of the blood draw (over an hour and a half after the collision).  Using a process called retrograde extrapolation, the State's expert was able to estimate the range of appellant's BAC at the time of the collision.

[6] A visiting judge presided over appellant's guilty plea and punishment hearing.  The elected presiding judge handled all other hearings.

3

court's ruling on whether to grant a hearing on a motion for new trial for an abuse of discretion. *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009). We will reverse only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Id*.

The purpose of a hearing on a motion for new trial is to decide whether the case should be retried and prepare a record for presenting issues on appeal in the event the motion is denied. *Id*. at 338. The right to a hearing on a motion for a new trial is not absolute. *Id*. To be entitled to a hearing on his motion for new trial, the defendant must first request one. *Rozell v. State*, 176 S.W.3d 228, 230 (Tex. Crim. App. 2005) ("Presenting the motion, along with a request for a hearing, is required to let the court know that the defendant wants the trial court to act on the motion and whether the defendant would like a hearing on the motion."). The defendant also must satisfy the procedural requirements that the motion be timely filed and actually presented to the trial court within ten days of the motion's filing date, unless the court extends that time period.[7] Tex. R. App. P. 21.6; *Stokes v. State*, 277 S.W.3d 20, 21 (Tex. Crim. App. 2009); *see also Cadoree v. State*, 331 S.W.3d 514, 527 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

A brief discussion of the procedural history of appellant's case is helpful to our analysis. In three separate cases, the State indicted appellant for (1) intoxication manslaughter of a peace officer, (2) evading arrest causing bodily injury, and (3) possession of a controlled substance. Appellant hired Jon Thomas (current appellate counsel) and Thomas's colleague as substitute defense counsel. The colleague subsequently withdrew from the case. At a subsequent trial setting,

---

[7] If those procedural demands are met, the trial court is obligated to hold a hearing only when two additional substantive requirements are also fulfilled: the motion for new trial must raise matters which cannot be determined from the record to date, and the particular matters raised must establish that reasonable grounds exist that could entitle the defendant to relief. *Smith*, 286 S.W.3d at 339; *Rozell*, 176 S.W.3d at 230.

Thomas and yet another lawyer appeared. The new lawyer "indicated that he was going to be hired," but different lawyers, Richard Detoto and Adam Brown, represented appellant at trial.[8] Appellant was tried for intoxication manslaughter on June 1, 2012, and the jury returned its punishment verdict on June 8th.

Also on June 8th, Detoto filed the notice of appeal. On June 11th, the trial court dismissed the cases against appellant for evading arrest and possession of a controlled substance. Kelly Ann Smith subsequently was appointed as appellate counsel. On July 9th, Smith filed a motion for new trial (the "First Motion"). On the same day, Thomas filed a motion for new trial (the "Second Motion") but filed it under the wrong cause number—in the dismissed case for possession of a controlled substance.

On July 20th, Thomas filed a motion to substitute himself as appellate counsel and for Smith to withdraw from the case. On August 8th, the trial court held a hearing for appellant to select his appellate counsel. The trial court noted:

> Let the record reflect that there were several resets, the case rocks along until March the 8th of this year, 2012. At that time the case was set for trial, that was a Thursday. And in this court a defendant that is set for trial is arraigned on that day and we pick a jury the next day.

> Well, the Court remembers quite clearly that on that particular day Mr. Thomas did show up, but at the same time there was another lawyer that showed up . . . who indicated that he was going to be hired in on the case.

> The Court specifically recalls that Mr. Thomas was more than glad to get off the case, practically ran out of the court. . . .

> This Court appointed Kelly Smith as [appellant's appellate] lawyer. And she signed on and she filed a timely Motion for New Trial.

---

[8] Not all substitutions of counsel appear in the clerk's record; however, the trial court additionally stated on the record her recollection of this history.

5

In the meantime, here comes Mr. Thomas, again, and I understand that he files a Motion for New Trial. However he files it on the wrong case, he files it on the case that has been dismissed and that was the possession of a controlled substance less than a gram.

. . . .

Now, let's talk about the fact that the Motions for New Trial that [Mr. Thomas] filed have been to the wrong case. What are you going to do about it?

Thomas stated, "[O]ne [motion] can be amended off of [Smith's timely filed motion]. Beyond that, I think that would solve the issue as far as getting . . . my file points on there." The Court responded, "Okay. Well, then, do what you have to do."

**No Request for Hearing on the First Motion**. Appellant argues the motions for new trial were "technically sufficient to obtain a hearing" because they were timely filed and, even though the record does not show that Smith presented the First Motion to the trial court, the trial court had notice of the First Motion, which appellant implies meets the presentment requirement. *See* Tex. R. App. P. 21.6 (requiring presentment of the motion to the trial court within ten days of filing, unless the court extends that time period). Even assuming the First Motion were timely presented to the trial court, that motion did not include a request for a hearing.[9] The trial court was not required to hold a hearing that was not requested. *See Rozell*, 176 S.W.3d at 230.

**Untimely Presentment of the Second Motion**. Appellant also argues he timely filed the Second Motion and timely presented it to the trial court. Appellant concedes that the Second Motion was filed in a dismissed case. However, he

---

[9] There is no evidence that Thomas amended Smith's motion, as suggested to the trial court.

6

asserts the trial court treated it as being filed in this case because the trial court acknowledged the existence of the motion at the hearing on August 8th. Appellant further asserts the Second Motion was presented to the trial court because the motion includes a certificate of presentment[10] signed by Thomas on July 9th and the trial court "took judicial notice" of the motion at the hearing on August 8th.

Even assuming filing the Second Motion in a dismissed case somehow amounted to a timely filing in this case,[11] appellant has not shown that he presented the Second Motion to the trial court in a timely fashion. To meet the presentment requirement, the record must show the movant for a new trial actually delivered the motion for new trial to the trial court or otherwise brought the motion to the attention or actual notice of the trial court. *Carranza v. State*, 960 S.W.2d 76, 79 (Tex. Crim. App. 1998). Merely filing a motion is not enough to show presentment. *Stokes*, 277 S.W.3d at 21.

Presentment may be proven in many ways, including by showing the judge's signature or notation on the proposed order or court's docket sheet or a ruling on the motion. *Thomas v. State*, 286 S.W.3d 109, 116 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (citing *Stokes*, 277 S.W.3d at 22, 24 and *Carranza*, 960 S.W.2d at 79). However, a counsel's statement that a motion for new trial has been presented is not enough to show presentment, as the purpose of presentment is to put the trial court on actual notice that the defendant desires the trial court to take some action such as rule or conduct a hearing on the motion for new trial. *See, e.g., Stokes*, 277 S.W.3d at 21; *Bearnth v. State*, 361 S.W.3d 135, 145 (Tex.

---

[10] The Second Motion is not part of the appellate record, but we assume for purposes of this analysis that it included the certificate of presentment referenced by appellant. The State included a copy of the Second Motion in the appendix to its appellate brief.

[11] In the August 8th hearing, appellant's counsel argued the Second Motion effectively amended the First Motion. He does not make that argument on appeal.

App.—Houston [1st Dist.] 2011, pet. ref'd) ("We cannot conclude that the presentment requirement was satisfied where the record shows only defense counsel's statement that the motion had been presented, but does not indicate that counsel in fact communicated the request for a hearing in a timely manner to a person capable of acting on it."); *Longoria v. State*, 154 S.W.3d 747, 762 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (holding trial court did not abuse discretion in denying motion for new trial by operation of law because motion was not properly presented, even though a "Notice of Presentment" was filed and the docket sheet contained an entry for the motion having been filed). Thus, the certificate of presentment signed by Thomas is not evidence that the trial court was on actual notice that appellant sought a hearing on the Second Motion. *See Bearnth*, 361 S.W.3d at 145; *see also Burrus v. State*, 266 S.W.3d 107, 115 (Tex. App.—Fort Worth 2008, no pet.) (holding that certificate of presentment and docket entry noting filing of motion were insufficient evidence of presentment).

Presentment must occur within ten days of filing the motion, unless the trial court, in its discretion, permits it to be filed within 75 days of sentencing. Tex. R. App. P. 21.6. Here, the record is devoid of any evidence that appellant presented the Second Motion to the trial court within ten days of filing it. The trial court first acknowledged it was aware of the Second Motion at the hearing on August 8th, nearly a month after the motion was filed. The record reflects that the trial court considered the motion to have been filed in a dismissed case and asked counsel "what [was he] going to do about it?" The trial court did not indicate that a request for hearing had been or could be made.[12] Appellant did not request the trial court to extend the ten-day timeframe for presentment or to hold a hearing. Appellant

---

[12] In fact, during a subsequent hearing on November 28th, the trial court stated, "I also seem to recall that Mr. Thomas had filed a Motion for New Trial regarding a case that had been dismissed. So, in effect, it was no good and all for naught."

8

has not shown on this record that he presented the Second Motion to the trial court in a timely fashion. Thus, he was not entitled to a hearing on the Second Motion.

We overrule appellant's first issue.

## II. Failure to Admonish Harmless Error

In his second issue, appellant contends the trial court erred in failing to admonish him of the possible deportation consequences of his guilty plea in violation of article 26.13 of the Texas Code of Criminal Procedure. Article 26.13 requires the trial court, prior to accepting a guilty plea, to admonish a defendant of, among other things, "the fact that if the defendant is not a citizen of the United States of America, a plea of guilty or nolo contendere for the offense charged may result in deportation, the exclusion from admission to this country, or the denial of naturalization under federal law." Tex. Code Crim. Proc. art. 26.13(a)(4).

The State concedes that appellant is not a United States citizen and that the trial court failed to admonish appellant, either orally or in writing, of the potential immigration consequences of his guilty plea. *See Gutierrez-Gomez v. State*, 321 S.W.3d 679, 681 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Federal due process requires that waivers of constitutional rights be voluntary, knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences. *Davison v. State*, 405 S.W.3d 682, 686 (Tex. Crim. App. 2013). A criminal defendant who enters a plea of guilty has by definition relinquished certain constitutional rights, such as his right to a trial by jury. *Id.* A trial court's admonitions to and inquiries of a defendant prior to his plea of guilty assure the court that the defendant's waiver of these rights in entering a guilty plea comports with due process; that is, the waiver was made voluntarily and with knowledge of the consequences of the plea. *VanNortrick v. State*, 227 S.W.3d 706, 708 (Tex. Crim. App. 2007). Article 26.13 is designed to provide these

9

constitutional assurances. *Id*. The article 26.13 admonitions, however, are not themselves constitutionally required. *Id*. Accordingly, the trial court's failure to admonish the defendant regarding the immigration consequences of his plea is non-constitutional error subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(b). *Id*.; *Gutierrez-Gomez*, 321 S.W.3d at 681.

When conducting a non-constitutional harm analysis in this context, we consider the entire record to determine whether we have a fair assurance that appellant's decision to plead guilty would not have changed if the trial court had admonished appellant about the adverse immigration consequences that the plea could produce, in accordance with article 26.13(a)(4). *VanNortrick*, 227 S.W.3d at 709; *Hines v. State*, 396 S.W.3d 706, 708 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In the "fair assurance" analysis, we consider the following three issues: (1) appellant's citizenship and immigration status; (2) whether appellant knew the consequences of his plea; and (3) the strength of the evidence of appellant's guilt. *Gutierrez-Gomez*, 321 S.W.3d at 681.

It is ultimately the responsibility of the reviewing court to determine whether the record supports or negates a defendant's assertion of harm. *Burnett v. State*, 88 S.W.3d 633, 639 (Tex. Crim. App. 2002); *Gutierrez-Gomez*, 321 S.W.3d at 681. If, after a conscientious examination of the record, we conclude "that an error may have had 'substantial influence' on the outcome of the proceeding," the error is not harmless. *Burnett*, 88 S.W.3d at 637-39. Put another way, if we have "a grave doubt" that the result was free from the substantial influence of the error, then we must treat the error as if it did. *Id*. at 637; *see also Gutierrez-Gomez*, 321 S.W.3d at 682.

### A. Citizenship and Immigration Status

As noted above, appellant's citizenship status is not in dispute. The record

reflects, and the State acknowledges, that appellant is not a United States citizen.

## B. Knowledge of Immigration Consequences

Before examining the strength of the evidence of the appellant's guilt, we must examine the record for any indication that the defendant knew the consequences of his guilty plea. *Van Nortrick* 227 S.W.3d at 713 (stating that the strength or weakness of the evidence against the appellant makes little difference to the harm analysis if the second factor above is not satisfied).[13]   To warrant reversal, the record must support an inference that the defendant did not know the consequences of his plea.  *Burnett*, 88 S.W.3d at 638; *Gutierrez-Gomez*, 321 S.W.3d at 682.  When the record is silent regarding the consequences of conviction in the context of a guilty plea, we must infer that the defendant did not know the consequences of his plea.  *VanNortrick*, 227 S.W.3d at 710-11; *Gutierrez-Gomez*, 321 S.W.3d at 682; *Kelley v. State*, 237 S.W.3d 906, 908 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).

A reviewing court may also consider record facts from which one would reasonably infer that a defendant did know the consequences of his plea. *Burnett*, 88 S.W.3d at 638; *Gutierrez-Gomez*, 321 S.W.3d at 681.  Only a few Texas cases outline the sort of record evidence that would support an inference that appellant was aware of the consequences of his guilty plea. *See, e.g.*, *Gutierrez-Gomez*, 321 S.W.3d at 682-84 (holding trial judge's statement during voir dire that appellant likely would be "automatically deported" if released on probation, along with

---

[13] Ultimately, we have no way of knowing what role the knowledge [of the prospect of deportation] would play in an individual defendant's decision about whether to plead guilty.  Regardless of the strength of the evidence of guilt, we have no fair assurance that the appellant would not have changed his guilty plea had he been properly admonished.

*VanNortrick*, 227 S.W.3d at 713.

references to deportation by defense counsel and prospective jurors supported inference that appellant knew consequences of plea); *Hwang v. State*, 130 S.W.3d 496, 500–01 (Tex. App.—Dallas 2004, pet. ref'd) (holding statements during voir dire and oral motion in limine were merely "opaque references to deportation but . . . silent about whether appellant was actually informed that a guilty plea could result in his deportation" and insufficient to support inference appellant knew consequences of his plea). We do not have a silent record. As explained below, the record contains evidence from which a reasonable inference can be drawn that appellant knew firsthand the deportation consequences of entering a guilty plea.

**Appellant's Deportation History**. A deportation officer from the United States Immigration and Customs Enforcement (ICE) testified at trial that when a person is apprehended in this country illegally, he is assigned an Alien Registration Number, which is a unique identifier for that person. An FBI identification record for appellant was admitted at trial that contained, among other things, appellant's criminal history and fingerprint cards with his fingerprints, birthdate, FBI number, and Alien Registration Number.

The criminal history included, as relevant to this discussion, three offenses—two committed on December 29 and December 31, 2005 for attempting to enter the United States illegally and one committed on May 29, 2011 (the day after the collision) for which appellant was charged with "alien removal." We discuss each of these offenses in turn.

The ICE officer testified when someone attempts to cross the border at a port of entry, he is questioned by a border patrol officer as to whether he can legally enter the United States. Appellant attempted to cross the border from Mexico into a port of entry at Brownsville, Texas on December 29, 2005. When he was

stopped, appellant initially claimed to be a "United States citizen by virtue of birth in Houston, Texas." He then admitted to being a Mexican national with no legal status in the United States. He was charged with attempting "to gain illegal entry into the United States." Appellant pleaded guilty to the charge and was ordered to be removed from the country. He received a "Notice to Alien Ordered Removed/Departure Verification," which notified him that he was prohibited from attempting to enter, entering, or being in the United States for five years from his date of departure. After that time, he could return to the United States only if he applied and was approved to enter the country legally. He signed a "Verification of Removal" at the bottom of the notice. A United States magistrate judge signed a judgment on December 30th.

The very next day, appellant again attempted to enter the United States through the port of entry in Hidalgo County, Texas. He again claimed to be a United States citizen by asserting he had been born in Houston, Texas, and presented a driver's license in support of his claim. He was charged again with attempting to gain illegal entry into the United States, pleaded guilty, and was ordered to be removed from the country. This time, he was notified that he could not attempt to enter, enter, or be in the United States for 20 years from the date of his departure. He signed another "Verification of Removal" at the bottom of that notice. A United States magistrate judge signed a judgment on January 9, 2006.

Thus, appellant, on two occasions, pleaded guilty to attempting to gain entry into the United States illegally and was deported. Consequently, he was aware that his guilty pleas resulted in his deportation twice. Moreover, appellant knew that he could not apply to enter the country for 20 years from the date of his last deportation.

On May 29, 2011, the day after the collision, appellant was charged with

13

"alien removal under section[s] 212 and 237."[14] Appellant did not plead guilty of intoxication manslaughter until June 1, 2012. Accordingly, he had been charged with removal long before he entered his guilty plea.

**Procedural History**. A review of the clerk's record reveals that, early in the case, the State filed a "High Bond Request" recommending denial of bail because appellant "is illegal and was previously deported." Moreover, the State gave notice before trial of its intent to introduce "unadjudicated offense (bad acts) evidence" of appellant's two previous deportations and that appellant falsely represented to an officer at the time of his arrest for intoxication manslaughter that he was a United States citizen.

At the hearing on appellant's motion to suppress the results of his blood test, State's counsel informed the trial court that appellant had been denied entry at the border on the two occasions referenced above. Appellant's counsel also argued at the hearing that appellant's statement to the officer about his citizenship status was an inadmissible custodial statement. Appellant was present at the hearing. Thus, appellant was aware that his immigration status was at issue before pleading guilty.[15] Further, before accepting appellant's plea, the trial court asked appellant,

---

[14] *See* 8 U.S.C. §§ 1182 (formerly section 212 of the Immigration and Nationality Act of 1952) (listing "[c]lasses of aliens ineligible for visas or admission"), 1227 (formerly section 237 of the Immigration and Nationality Act of 1952) (prescribing "[c]lasses of deportable aliens" to be removed from United States).

[15] After appellant pleaded guilty, a jury was selected to determine his punishment. During voir dire, State's counsel told the venire panel: "[O]ne of the things that often comes up is somebody will say, 'Well what about if . . . this person is not in the country legally.'" She continued, "[I]n and of itself, does that change the range of punishment? . . . . [I]t's like any other facts that you could hear at punishment. That's something that you get to consider."

Appellant's counsel also asked the venire panel during voir dire how they felt "about illegal immigrants." Several prospective jurors discussed their feelings about the different types of people who enter the country illegally, whether to "make a better life" or to "sell drugs and things like that." Thus, appellant was aware from the outset of trial that his immigration status was at issue.

14

"I think you've had time to talk to your attorneys of the consequences of this plea; is that correct?" Appellant responded, "Yes, sir."

**Appellant's Attempts to Improve Immigration Status**. The State also presented evidence that appellant worked with his attorney to arrange a marriage to improve his immigration status. Appellant's girlfriend testified at trial that, while appellant was in jail, they had multiple conversations "regarding [getting married] while he's in custody to help with his immigration status . . . because that's what . . . his lawyer told him to do."[16] She elaborated, "We were planning on getting married before the accident. And after the accident, his previous lawyer had . . . advised him to get married in order for him to become a U.S. citizen and stay."[17] Appellant's mother also testified that appellant's previous lawyer had advised him to get married "so it would help his case." This evidence indicates appellant and his trial attorney had discussed the effect of his immigration status on his ability to stay in the United States.

Considering the record as a whole, we conclude that a reasonable inference could be drawn that appellant was aware of the immigration consequences of his plea. We cannot ignore the fact that, on two previous occasions, appellant, after having pleaded guilty to entering the United States illegally, already had been deported. Thus, he was aware that deportation would be the likely result of a guilty plea. Appellant's knowledge and awareness of deportation consequences resulting from violation of the law is especially significant because it came from his personal experience rather than a questionable source. Moreover, appellant knew from his own encounters that violations of lesser offenses did not merely

---

[16] She had been dating appellant approximately six months at the time of the collision.

[17] She further testified that they discussed getting married so appellant could get out on bond, which indicates that appellant was considering getting married for both purposes—to "stay" in the country and get out on bond.

15

carry the possibility of deportation but resulted in actual deportation. Personal experience can and usually does have far greater impact than information read in court. Indeed, appellant was already in the country illegally and already had been charged with removal when he entered his guilty plea. These facts, coupled with appellant's lying to a police officer about his immigration status, discussions with his previous counsel regarding a strategy to "stay" in the United States and admission that he discussed the consequences of his guilty plea with trial counsel, all indicate that appellant was aware of the immigration consequences of his plea.[18]

### C. Evidence of Appellant's Guilt

Finally, the strength of the evidence of appellant's guilt was overwhelming. Numerous eye-witnesses observed appellant veer past the highly visible barricade and the resulting collision; an officer in fact chased appellant in her patrol car with the lights and siren activated after appellant passed the barricade; appellant had obvious signs of intoxication, including an odor of alcohol, staggering, glossy eyes, slurred speech, and a blood alcohol content of .191 almost two hours after the collision; and opened and unopened bottles of beer were in the front floorboard of the vehicle. *See, e.g., Gutierrez-Gomez*, 321 S.W.3d at 684-85.

Considering the record as a whole, we have a fair assurance that appellant's decision to plead guilty would not have changed had the trial court admonished appellant regarding the possible deportation consequences of his guilty plea. Accordingly, the error was harmless.[19]

---

[18] This case is distinguishable from one in which the record is completely silent regarding an appellant's knowledge of the consequences of his plea. *See, e.g., Hwang*, 130 S.W.3d at 500–01 (holding record insufficient to support inference appellant knew consequences of his plea when record "is silent about whether appellant was actually informed that a guilty plea could result in his deportation").

[19] Appellant includes a section at the end of his second issue citing *Padilla v. Kentucky*, 559 U.S. 356, 369 (2010), which requires defense counsel to advise a noncitizen defendant as to

We overrule appellant's second issue.

## III. No Evidence of Ineffective Assistance

In his third issue, appellant complains that he received ineffective assistance of counsel because his counsel allegedly (1) advised appellant to plead guilty and allow the jury to assess punishment and (2) failed to consult experts and independently investigate the facts, including whether "a power steering problem" contributed to the collision.

To establish ineffective assistance of counsel, appellant must show by a preponderance of the evidence that his counsel's representation fell below the standard of prevailing professional norms, and but for counsel's deficiency, there is a reasonable probability that the result of the trial would have been different. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In determining whether an attorney's performance was deficient, we apply a strong presumption that the attorney's conduct was within the range of reasonable professional assistance. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). We review the effectiveness of counsel in light of the totality of the representation and particular circumstances of each case. *Lopez*, 343 S.W.3d at 143. When, as in this case, there is no proper evidentiary record developed at a hearing on a motion for new trial, it is extremely difficult to show trial counsel's performance was deficient. *Jagaroo v. State*, 180 S.W.3d 793, 797 (Tex. App.—

---

the immigration consequences of his guilty plea. *See Ex parte Fassi*, 388 S.W.3d 881, 886 (Tex. App.—Houston [14th Dist.] 2012, no pet.). However, appellant neither argues nor presented evidence below that his counsel did not advise him of the immigration consequences of his guilty plea.

17

Houston [14th Dist.] 2005, pet. ref'd); *see also Thompson*, 9 SW.3d at 814 ("An appellate court should be especially hesitant to declare counsel ineffective based upon a single alleged miscalculation during what amounts to otherwise satisfactory representation, especially when the record provides no discernible explanation of the motivation behind counsel's actions—whether those actions were of strategic design or the result of negligent conduct."). Trial counsel may have had a specific strategy for his conduct, and a reviewing court may not speculate on trial counsel's motives in the face of a silent record. *Thompson*, 9 S.W.3d at 814.

Here, other than appellant's admission that his counsel informed him of the consequences of his plea, discussed above, the record is silent as to any discussions appellant and his attorney had regarding appellant's choices to plead guilty and to allow the jury to assess punishment—the record does not reveal how or when appellant made these decisions, or whether he decided to do so on his own or through the advice of counsel. Similarly, the record is silent as to the manner in which appellant's counsel investigated the case, whether he consulted with experts or needed to do so, and the extent to which he researched the cause of the collision, even assuming that was necessary under the facts of this case. On this silent record, with no proper evidentiary record developed at a hearing on a motion for new trial, we may not speculate on the motives underlying trial counsel's strategic decisions. *See id.*; *see also Lopez v. State*, 200 S.W.3d 246, 257-58 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd).

Appellant also argues he was constructively denied assistance of counsel based on his counsel's behavior "as a whole." A defendant is constructively denied assistance of counsel when defense counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. *See Cannon v. State*, 252 S.W.3d 342, 349 (Tex. Crim. App. 2008) (citing *United States v. Cronic*, 466 U.S.

18

648, 658-59 (1984)). Under those rare circumstances, prejudice, because it is "so likely," is legally presumed. *Id.*

In *Cannon*, after the trial court denied defense counsel's motions for continuance and recusal, defense counsel declared he was not ready for trial and would not participate and thereafter declined to participate in jury selection, enter a plea for his client, make an opening statement or closing argument, cross examine the State's witnesses, make objections, offer a defense, request special jury instructions, or offer any evidence or argument during the punishment phase. *Id.* at 350. The Court of Criminal Appeals accordingly held that defense counsel's behavior, considered as a whole, constructively denied the defendant his right to effective assistance of counsel by counsel's "effectively boycott[ing] the trial proceedings and entirely fail[ing] to subject the prosecution's case to meaningful adversarial testing." *Id.*

Appellant does not point to any instances of deficient performance by his counsel. In fact, a review of the record demonstrates his counsel was prepared for and participated in all aspects of the trial. Defense counsel presented and argued a motion to suppress the results of appellant's blood test after the collision. During the hearing on the motion, counsel cross-examined the State's witnesses, took the State's expert on voir dire to assess his qualifications and reliability, and presented evidence in support of the motion. Defense counsel also participated vigorously in voir dire and the punishment phase of trial by objecting numerous times to the State's evidence and to certain testimony from the State's witnesses, cross-examining the State's witnesses, introducing defensive exhibits, calling character witnesses to testify on behalf of appellant, and arguing zealously that a lengthy sentence was unwarranted under the circumstances. Appellant has not demonstrated on this record that his counsel entirely failed to subject the

19

prosecution's case to meaningful adversarial testing. *See Head v. State*, 299 S.W.3d 414, 443 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (refusing to find defense counsel per se ineffective when "trial counsel participated in all aspects of appellant's trial[, including participating in] jury selection, mak[ing] opening and closing statements, fil[ing] motions, mak[ing] objections, cross-examin[ing] the State's witnesses, call[ing] defense witnesses, and request[ing] special jury instructions").

We overrule appellant's third issue.

### *Conclusion*

We affirm the judgment of the trial court.

/s/     Martha Hill Jamison
         Justice

Panel consists of Chief Justice Frost and Justices Jamison and Wise.

Publish — TEX. R. APP. P. 47.2(b).