Opinion filed January 14, 2021



In The

# Eleventh Court of Appeals

_____

## No. 11-19-00005-CR

_____

## CHARLES EDWARD NEWMAN, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 350th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 13399-D**

## M E M O R A N D U M   O P I N I O N

The State charged Charles Edward Newman by indictment with one count of murder and two counts of tampering with a witness. The jury convicted Appellant of all three counts and assessed punishment for the murder conviction at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice and a fine of $10,000. The jury assessed Appellant's punishment at imprisonment for sixty years for each of the tampering-with-a-witness convictions,

and the jury also assessed a fine of $8,000 for each of the tampering cases. The trial court sentenced Appellant accordingly, and it ordered that the sentences were to run concurrently. We affirm.

In four issues on appeal, Appellant challenges (1) the sufficiency of the evidence to support the murder conviction, (2) the sufficiency of the evidence to support the witness tampering convictions, (3) the trial court's denial of a hearing on his motion for new trial, and (4) the admission, over a spousal privilege objection, of a recorded conversation between Appellant and his wife.

On May 18, 2016, Justin White found the body of his ex-girlfriend, Kendra Keppler, in her Abilene home. No one had seen or heard from Keppler for several days, and White went to check on her. White entered the house with his own key and discovered a body on the bed in Keppler's room. The body showed signs of trauma to the face and was in a state of decomposition, but White was able to identify it as Keppler because of a naval piercing. After he discovered Keppler's body, White immediately left the house and called the police.

Detective Paul Martinez, of the Abilene Police Department (APD), was the lead detective on the case and went to Keppler's home. Because the body was already in a state of decomposition, investigators did not immediately know the cause of death or suspect foul play. However, Detective Martinez attended the autopsy and learned that Keppler had been shot. Dr. Tasha Greenberg, the deputy medical examiner who performed the autopsy, concluded that the cause of death was a gunshot wound to the head. Dr. Greenberg could not determine the precise time of death, but she estimated that it was up to five days prior to the time that White discovered the body. After Detective Martinez learned that Keppler had suffered a gunshot wound, he returned to the scene to look for a shell casing. He located a casing under the bed.

Detective John Wilson was assigned to conduct interviews with suspects and community members. He interviewed White briefly at the scene and again at the law enforcement center. Among other things, White told Detective Wilson that Appellant was Keppler's boyfriend. Detective Wilson interviewed Appellant at the law enforcement center on the evening that the body was found. Detective Wilson recorded the interview. During the interview, Appellant denied that he was in a romantic relationship with Keppler.

On the evening that White discovered Keppler's body, law enforcement conducted a search for her vehicle because it was missing from the scene. Keppler drove a white Hyundai.

As we will detail later in this opinion, Appellant was in possession of Keppler's vehicle at times relevant to the murder. During his first interview, Appellant told Detective Wilson that he had Keppler's vehicle because she had loaned it to him so that he could look for new housing. However, several witnesses testified that Keppler did not let anyone borrow her vehicle. For example, White testified that Keppler was "protective" of her vehicle and only let him drive it once or twice for a short trip. Anthony Sapp, Keppler's roommate and good friend, testified that Keppler was "stingy" with her vehicle and did not loan it out. Carol Price, who had a "mother-daughter relationship" with Keppler, testified that Keppler was "very proud of [her vehicle]" and did not allow Price to drive it.

During the recorded interview with Detective Wilson, Appellant stated that he had been to Keppler's house to attempt to return the vehicle on May 15, but no one responded when he knocked on the door. Appellant further said that he returned to the house on May 16 to look for Keppler. In the May 18 interview, when asked when he last entered Keppler's house, Appellant told Detective Wilson that he went inside the house "today." Appellant informed Detective Wilson that he went to the house that day and opened the back door, which was unlocked, but that he came

3

right back out and shut the door. When asked whether he smelled anything when he entered the house, Appellant responded that there was a strong odor but that he had assumed the odor was from the dog. Appellant first said that he did not find Keppler's body, but later during the same interview, he admitted that he had entered Keppler's home and had found Keppler's body in her room.

The next day, May 19, Detective Wilson received a tip that a check had been drawn on Keppler's account on May 18, the day that White discovered Keppler's body. A bank employee had heard about Keppler's death on the news and remembered that Keppler, or someone posing as Keppler, had withdrawn money from Keppler's account. The withdrawal was payable to Appellant. Later that day, the fraud department of the APD obtained a warrant for Appellant's arrest on a fraud charge. When detectives searched Appellant's house, they found notes that contained Keppler's identifying information, including her name, date of birth, Social Security number, and telephone numbers—all information that would be needed to withdraw money from Keppler's account.

After law enforcement officers arrested Appellant on the fraud warrant, Detectives Wilson and Martinez interviewed Appellant a second time. During the second interview, Detectives Wilson and Martinez questioned Appellant about the contents of his cell phone; Appellant had voluntarily provided the cell phone during his first interview.

The data extraction from Appellant's cell phone showed that he had attempted to log into Keppler's bank account in the days immediately before her body was found. The first attempt was made at 2:22 a.m. on May 16. Appellant visited the bank website again on May 17 at 6:59 p.m., 11:53 p.m., and 11:56 p.m. Bank records indicate that $200 was withdrawn from Keppler's account on May 18 at 1:40 p.m. That was the withdrawal that resulted in Appellant's arrest for fraud.

4

During the second interview, Detectives Wilson and Martinez attempted to create a timeline of events for Appellant's whereabouts on the day that Keppler's body was found. Appellant did not provide precise times, but he stated that he went to a meeting with his parole officer that morning at 8:00 a.m. He left his parole meeting and returned to his house around 10:30 a.m. He left his house and went to Keppler's house around 11:30 a.m. He stayed at Keppler's house for a short time and went back to his house. When Appellant returned to his house, he had his wife, Rachell Newman, impersonate Keppler on the phone to withdraw money from Keppler's account. During the second interview, Appellant repeatedly denied that he had had his wife call the bank to withdraw funds from Keppler's account. But Appellant eventually admitted that his wife made the phone call; separately, she also admitted it.

Also, in the second interview, Appellant told the detectives that he did not have an account in his name at Keppler's bank. He originally said that the $200 that he withdrew was "dope money" from drugs that he and Keppler had sold together. However, at trial, Appellant testified that the funds that he withdrew from Keppler's account were his and that Keppler maintained the account for him to use at will. When asked why he let the detectives believe that the money was for drugs, Appellant said that he "just didn't tell [the detectives]" the truth during the second interview.

As to why other people held money for him, Appellant testified that, because he owed back child support, the Texas Attorney General had placed a hold on his bank accounts. Therefore, he asked other people to hold money for him to avoid garnishment. Alicia Curiel, the mother of one of Appellant's children, testified that she sometimes held money for Appellant in an account under her name. Amy Sue Mitchell, Appellant's on-again and off-again girlfriend, also testified that she sometimes held money in an account for Appellant.

As a part of the investigation, law enforcement officials obtained a data extraction from Appellant's cell phone. The extraction contained records of numerous messages sent to Keppler in the three days before Keppler's body was found. On May 15, Appellant texted Keppler five times asking her where she was, what she was doing, and why she had not called or texted. On May 16, Appellant sent a message in which he wrote that he was worried about her; he asked her to call him.

Appellant did not text Keppler on May 17. However, on May 18 at 1:09 p.m., Appellant sent two messages to Keppler telling her that he would report her missing to the police if she did not reach out and contact him. Appellant sent those messages even though, according to Appellant's admissions to Detectives Martinez and Wilson, he already knew that Keppler was dead because he had been in her house and had seen her dead body. Appellant's final text to Keppler was sent at 7:05 p.m. on May 18, more than seven hours after he went to her house and saw her body.

As part of the investigation, Detective Martinez obtained data extractions from two cell phones that were found with Keppler's body. The extraction reports reflected that Keppler's last phone calls were made at 8:01 a.m. and 10:01 a.m. on May 14. Keppler's last text messages were sent at 10:35 a.m. and 11:38 a.m. on May 14. Unfortunately, not all the data could be extracted from the phones. However, the State admitted a video recording of the physical phone. The video depicted the phone screen as Detective Martinez scrolled through Keppler's text messages. The video recording showed messages between Keppler and Appellant on May 12, two days before Keppler sent her last communications by phone. In the messages, Appellant and Keppler appear to be arguing about money. Their texts began late in the evening on May 12 and continued into the early morning hours of May 13. In the messages, Appellant informed Keppler that he was "dead broke" and

"flooded with bills" but that she will "get back what [she has] put forward" when he has it.

Keppler replied in one of the text messages to Appellant that she had been "stupid enough to believe [he] was different." Appellant told Keppler that she was "special" to him and that he loved her. On the morning of May 14, Keppler asked Appellant if she could "come see [him]." When Appellant declined to see her, she sent a message at 9:20 a.m. in which she opined that, if Appellant loved her, he would be with her "period point blank." Keppler's phone showed a final outgoing phone call to Appellant at 10:16 a.m. on May 14. The content of these messages was retrieved only from Keppler's phones. The content of the same messages had been erased from Appellant's phone. But beginning on May 15, the content of the messages sent by Appellant to Keppler after she was dead matched those reflected in the extraction reports from both Appellant's phone and Keppler's phones.

Detective Martinez also extracted Appellant's call history from his cell phone and assigned other detectives to follow up on calls made between May 14 and May 18. Detective Jeff Cowan, another investigator on the case, identified Romeo Ross as one of the people whom Appellant contacted during that time frame. Ross testified that detectives from the APD contacted him to question him about a potential murder weapon. Ross said that he once sold crack cocaine to Appellant in the alley behind Keppler's house. A few days later, Appellant contacted Ross and wanted to sell Ross a pistol. Ultimately, Appellant traded money and a .380 Cobra pistol to Ross for crack cocaine. Ross testified that Appellant was driving a white car when they made the exchange. Although Ross did not remember the exact date that he and Appellant made the exchange, he testified that it was around May 15. He remembered the date because it was at the end of his girlfriend's pay period.

Shortly after Ross acquired the pistol from Appellant, he sold it to his uncle. Ross helped the detectives contact his family members, and the pistol was eventually

7

turned over to the police. Forensic scientist and certified firearms expert Alexis Moser performed an analysis on the pistol, cartridges, and bullet fragment from Keppler's body. The pistol and the bullet fragment were a match. The serial number on the pistol matched a weapon that Keppler had purchased earlier that month—it was her pistol.

Appellant testified that he traded the pistol to Ross for crack cocaine. Appellant also testified that he knew that Keppler had a pistol because he went with her when she purchased it. When asked how he came to possess the pistol, he said that he found it in his wife's purse and decided to sell it, in part, because of his status as a convicted felon. Anthony Devon Evans, Appellant's cousin, testified that Appellant called him to "vent" when Appellant found the pistol in Rachell's purse. Detective Martinez, who monitored more than 5,000 of Appellant's jail calls, testified that the first time that anyone mentioned the pistol had been found in Rachell's purse was in May 2018, immediately before Appellant's case was first set for trial.

Detective Martinez also checked Appellant's pawn records as part of the investigation because it appeared that Appellant had returned to Keppler's residence several times before White discovered her body. Detective Martinez testified that APD uses a system called Leads Online for pawnshops to log newly received merchandise so that law enforcement personnel can cross-reference the data to look for stolen items. Appellant's Leads Online records showed that he pawned a radar detector and a pair of Versace sunglasses on May 16; a car audio kicker and car audio speakers on May 17; and a "bookshelf stereo with speakers" on May 18. Detectives recovered the sunglasses, which White identified as Keppler's. Appellant denied that the sunglasses were Keppler's; he said they were his wife's.

Throughout the investigation, Detective Martinez interviewed several people who told him that a man named "Gorilla" had recently pulled a gun on Keppler

during a dispute. White told the detectives in his initial interview that, if anyone had harmed Keppler, it was probably Robert Jones, a/k/a "Gorilla." Rhiana Walker, Keppler's friend, testified that she had witnessed the incident and had heard Gorilla tell Keppler, "[Y]our days are numbered, bitch." During his first interview, Appellant also told Detective Wilson the story about Gorilla. Price also testified that Gorilla had pulled a gun on Keppler and that the incident caused Keppler to buy a gun for protection. Detective Martinez testified that they were never able to locate Gorilla but that they found no other evidence that linked him to Keppler's murder.

Detective Cowan received a tip that Priscilla Montez might have information about the case, and he interviewed Montez on May 20. Although Detective Cowan did not know it when he first contacted Montez, he came to believe that Appellant and Montez had a romantic relationship. Detective Cowan described Montez as "standoffish" and "very emotional" and said that she appeared "torn" about her loyalty to Appellant.

At trial, Montez testified that she and Appellant were in a romantic relationship. They had plans together on May 14, but Appellant neither contacted her nor met her as planned. When Appellant did not show up as planned, Montez texted him repeatedly. Montez testified that, when Appellant finally replied on May 15, he said that something had come up and that "there were some things that he needed to handle." Because it was unusual for Appellant to ignore Montez, she was worried about him and drove by his house on the evening of May 16. Montez drove by in the evening because she knew that Appellant had an ankle monitor as a condition of his parole and was required to be home by 7:00 p.m. When she drove by his house that evening, she saw a white vehicle in Appellant's driveway.

Montez did not hear from Appellant again until May 17 when he asked her to come to his house to talk. When Montez went to Appellant's house, he was in an emotionally stressed state. Appellant told Montez that something had happened and

that "he had killed her." Appellant never told Montez who "her" was, and she did not press the subject with him. She did ask Appellant about the white vehicle, and he told her that a friend had let him borrow it. Montez also testified that Appellant told Montez that he had returned to the place where he had killed "her" to take the vehicle back and to get some of "his" things to pawn. Montez remembered that Appellant had said that he had pawned a speaker. In her statement, Montez also referred to "some electronic items."

Montez did not ask Appellant for more details, but while she was with him, he continued to repeat that he had "killed her." Appellant also told Montez that "her" body was where he "left her" and that things were "fixing to blow up." Montez stayed at Appellant's house for a couple of hours before Appellant drove her home in the white vehicle.

On the drive to Montez's house, Appellant stopped at a convenience store. Appellant went inside the store, and Montez stayed behind in the vehicle. While Appellant was in the convenience store, Montez looked through the glove compartment; she found an insurance card with Keppler's name. Montez testified that, after she found the insurance card, she believed Keppler was the "her" that Appellant had been talking about. When Montez got home, she told her roommate about what had happened. Soon thereafter, Detective Cowan contacted Montez for an interview. At trial, Appellant said that Montez's statement was false and that he had never confessed to her or anyone else.

Three months later, on August 23 at 2:04 p.m., Detective Martinez received a phone call from Montez; she asked to "recant" her statement. Detective Martinez thought it was suspicious for Montez to ask to "recant" her statement because "regular people don't use that type of language." He checked Appellant's jail records and noted that Appellant's attorney at the time had visited Appellant at

1:00 p.m. on the same day. At 3:52 p.m. on the same day, Rachell Newman also called Detective Martinez and asked to recant her statement.

Although Montez indicated that she wanted to recant her statement, she never formally did so. She testified that she did not want to believe that Appellant was guilty and that her belief was one of the reasons that she wanted to recant her statement. Montez testified that she was hurt at the time she gave her statement because Detective Cowan had suggested that Appellant had a romantic relationship with Keppler. However, Montez testified that her statement was true and voluntary, even though she was hurt and confused at the time. She further testified that no one told her to try to recant her statement.

Montez also testified that she loved Appellant and that she did not want to participate in the trial, but she was subpoenaed. Appellant called Montez frequently, and they maintained a romantic relationship even though he was incarcerated.

The State introduced four phone calls between Montez and Appellant where the two discussed options for Montez to avoid a subpoena. Montez testified that she knew that all jail calls were recorded. In one of the calls, Appellant suggested that Montez leave town to take care of one of his children so that she could possibly avoid the subpoena. In another call, Appellant brought up other ways that Montez could avoid a subpoena. Appellant explained that, if Montez ignored the subpoena, she would only receive jail time or a fine and that, if she received a fine, he would "take care of it." Montez testified that she understood Appellant to mean he would pay any potential fine for her. Montez testified that she obeyed the subpoena because she wanted to do the right thing and wanted to avoid any further trouble and involvement.

Appellant disputed that he was encouraging Montez to avoid the subpoena. In reference to the conversation wherein Appellant suggested that Montez leave to take care of his children, Montez explained that she was staying with a friend and

housing was difficult for her. Montez told Appellant that "they" had gone to CPS and that her friend had lost visitation rights with her children because Montez was staying with her. Appellant testified that he wanted to find a place for Montez because she had nowhere else to go and that "I'll take care of it" referred to the situation with CPS.

During the investigation, Detective Martinez received two letters with additional information about this case. The first letter was from Jeron Davis, who was being held in the Taylor County Jail. Detective Martinez went to the jail to interview Davis, who said that he had been contacted by Aretha Richardson in February 2016. Davis said that Aretha had asked him to kill Keppler. However, Davis was incarcerated at the time of Keppler's death.

At trial, Davis testified that he had met Keppler a couple of times. He believed that she and Johnny Richardson were dating. He said that Aretha, Johnny's wife, offered him money to "handle" the situation. Detective Martinez testified that Davis mentioned that he and Appellant were in adjacent cells and that they had spoken about the case briefly. Davis denied that he had spoken to Appellant about the case. Davis did confirm that he was in an adjacent cell to Appellant, but he said that he spoke to Detective Martinez before he and Appellant were placed in adjacent cells.

Detective Martinez received a second jail letter from Saul Raul Solis in May 2016. In the letter, Solis claimed that he went to purchase methamphetamine from Keppler between 7:30 and 8:00 p.m. on May 13. In his letter, Solis gave a detailed description of the interior of Keppler's house as seen from the outside doorstep. Solis also said in the letter that he knocked on the door of Keppler's house and that a "white male in his early 30's [sic] to mid 30's [sic]" with a "[s]ilver or [c]hrome pistol in his waist" answered the door. Solis went on to describe his interaction with the white male, who purportedly told Solis that Keppler did not want to see anyone.

12

In the letter, Solis said that Keppler stuck her head around a doorway and asked what Solis wanted to purchase; Solis provided the details of the drug transaction.

Solis was transferred to several different facilities during his incarceration, and Detective Martinez was not able to interview him until December 2016. When he did finally get interviewed, Solis confirmed the contents of the letter. However, in January 2017, Solis contacted Detective Martinez to change his story. Detective Martinez interviewed Solis again in June 2017, and Solis denied the truth of the contents of the letter. At trial, Solis testified that he had never been to Keppler's house and that he had never purchased drugs from her. He said that he wrote the letter because Appellant approached him and asked if he would be willing to "help him out" in exchange for $1,000.

Solis accepted the offer and agreed to draft a letter on behalf of Appellant. He testified that he and Appellant stayed up late to discuss the layout of the house and other details to include in the letter. He further testified that other members of his cell block contributed to the letter. Rumors were circulating to the effect that Keppler had robbed someone from the Aryan Brotherhood, or another Aryan gang, and Appellant and Solis thought it would be helpful to include a white male with a gun in the fabricated story. Solis said that he made "two or three" copies of the letter: one each for the detective, Appellant, and Appellant's attorney.

Solis never received the $1,000 that Appellant promised him. He testified that he probably would not have agreed to draft the letter without the promise of payment. When asked why he stood by the contents of the letter at his first interview with Detective Martinez, Solis testified that he was hopeful that Appellant would still come through on the promise to deposit the funds into his account. However, after some time had passed, Solis decided that he could not live with the lies in the letter, and he contacted Detective Martinez to tell the truth.

Appellant testified that he knew Solis while they were in the Taylor County Jail, but he disputed that he told Solis what to write in the letter. He testified that he did not speak about his case while he was in jail and that Solis had approached him independently and started a conversation about Keppler. Appellant's version of Solis's involvement is that Solis first described the events that later were included in the letter and then Appellant asked Solis if he would be willing to write down his experience to help Appellant out. Appellant testified that Solis was hesitant to get involved and that that is why Appellant offered Solis $100, not $1,000, to write the letter. Appellant denied that he offered Solis $1,000. Appellant stated that Solis showed him the letter but that he did not proof, edit, or otherwise approve of the letter.

At trial, Appellant testified that he and his wife Rachell were separated and going through a divorce. Appellant testified that he still calls his wife but that they do not speak on a regular basis and their calls frequently end badly. He testified that he was "not in love with her" and did not want to be with her. The trial court admitted, over a spousal privilege objection, a recorded phone call, offered as impeachment evidence, between Appellant and Rachell. Before the recording was offered, Appellant testified that he understood that all of his jail phone calls were subject to monitoring and recording.

In the recording, Appellant and Rachell expressed their love and affection for each other, and Appellant asked Rachell if she wanted to be together. Rachell and Appellant both said that they wanted to make their marriage work. Appellant also told Rachell that the State was starting to subpoena people for the upcoming trial, and Rachell responded, "[G]ood luck finding me." When asked whether Appellant was surprised that the State failed to locate Rachell, Appellant responded that "[a] lot of things don't surprise [him] no more."

14

In his first and second issues on appeal, Appellant argues that his convictions for murder and witness tampering are not supported by sufficient evidence. We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

When conducting a sufficiency review, we consider all of the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly proves a defendant's guilt; direct and circumstantial evidence are both probative of guilt, and we review all of the evidence to determine the "combined and cumulative force." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)). Circumstantial evidence alone is sufficient to establish guilt, and the standard of review is the same for both direct and circumstantial evidence cases. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

The jury convicted Appellant of murder, as alleged in paragraph one of the indictment, by intentionally or knowingly causing the death of Keppler. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2019). Appellant contends in his first issue on appeal that the State failed to prove that he possessed the required intent for the murder conviction because the State produced no direct evidence of intent. We disagree.

Mental culpability is a question of fact to be determined by the jury from all the facts and circumstances. *Walter v. State*, 581 S.W.3d 957, 972 (Tex. App.— Eastland 2019, pet. ref'd). Because it is impossible to read the mind of the accused, proof of a culpable mental state is inferred from the circumstances surrounding a defendant's "acts, words, and conduct." *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018) (quoting *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991)). We look to events occurring before, during, and after the offense. *Guevara*, 152 S.W.3d at 49. A defendant's motive, any attempts to conceal the body, inconsistent statements or improbable explanations to law enforcement, and the extent of the victim's injuries are circumstantial evidence from which a jury can infer a defendant's intent. *Nisbett*, 552 S.W.3d at 267. Further, the specific intent to cause death can be inferred from the use of a deadly weapon, such as the firearm used here. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *see* PENAL § 1.07(17)(A) (West Supp. 2020) (defining a firearm as a per se deadly weapon).

Just as a jury may infer intent, it may also infer guilt from circumstantial evidence. *Guevara*, 152 S.W.3d at 49. For example, acts by the defendant, such as an attempt to tamper with a witness, constitute evidence of a "consciousness of guilt." *Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999). Courts have also found that a defendant's use of a missing person's financial assets is also circumstantial evidence of guilt. *Nisbett*, 552 S.W.3d at 267 (finding that a check forged after a victim's disappearance was some circumstantial evidence of guilt).

16

Here, the jury could have reasonably inferred from the overwhelming circumstantial evidence that Appellant possessed the requisite intent to kill Keppler. Although Keppler's exact time of death is unknown, we do know that her last communications by phone were made on the morning of May 14. The jury heard evidence that Appellant and Keppler had an argument about money on May 12 and 13, shortly before her estimated time of death. Appellant deleted the messages from his own phone, but the detectives recovered them from Keppler's phone.

Appellant's behavior after the estimated time of death provides further circumstantial evidence of intent. Appellant used Keppler's car, pawned her personal property, and accessed her bank account after the two argued about money. Based on Appellant's actions immediately before and after Keppler's estimated time of death, a jury could logically conclude that he acted with the required intent.

Further, a jury could have inferred intent and guilt from Appellant's inconsistent statements throughout the investigation. Appellant gave varied accounts of when he returned to and entered Keppler's house between May 12 and May 18. He first told detectives that he never discovered Keppler's body, but he later admitted that he did find her body. Appellant also made inconsistent statements about why he accessed Keppler's bank account. First, Appellant said that part of the money in the account was his from joint drug deals with Keppler, but he later said that the money was all his and that Keppler was just holding the money for him.

Text message data on Appellant's phone was also inconsistent with the statements he made to the investigating detectives. He continued to send text messages to Keppler even after, according to his own admission, he had discovered her body and knew that she was dead. Based on all of Appellant's inconsistent statements and attempts to mislead detectives, a jury could have reasonably inferred that he was attempting to manufacture an alibi so that the police would not connect him to the murder.

17

In addition to the evidence of motive and inconsistent statements, other evidence was presented that suggested that Appellant continued to attempt to manufacture an alibi and mislead the investigation even after he was arrested. Solis testified that Appellant solicited his help to write a letter that would provide Appellant with an alibi. Solis explicitly stated in his letter that he saw Keppler alive between 7:30 and 8:00 p.m. on May 13—after Appellant's electronically monitored parole curfew. Additionally, Solis's letter implicated an unknown third party, the "white male" from the Aryan Brotherhood. The letter from Davis implicated another party entirely. Although Appellant disputed his involvement with both letters, we assume that the jury resolved the conflicting testimony in the State's favor.

Other evidence further implicated Appellant in Keppler's murder. Appellant traded the murder weapon for crack cocaine on or about May 15, the day after Keppler sent her last messages. Appellant admitted to Montez that he had "killed her." Although Montez did not know who "her" was, a jury could have rationally inferred that Appellant was referring to Keppler based on the ample circumstantial evidence in the case. Even though Appellant disputed how he came to possess the murder weapon and that he made any admission to Montez, we assume that the jury also resolved the conflicting testimony in the State's favor.

The jury could also have inferred a "consciousness of guilt" from Appellant's attempts to tamper with witnesses in the case. Although the tampering charges are discussed separately below, the State produced evidence that Appellant suggested to Montez that she relocate to avoid service and that Appellant offered to "take care of" any potential fines that Montez might be assessed should she ignore a subpoena to testify against him. The State also produced evidence that key witnesses, Montez and Rachell, attempted to recant their statements after Appellant and his first attorney met before Appellant's first trial. These interactions with witnesses are

18

circumstantial evidence from which a jury could determine Appellant's "consciousness of guilt."

In light of the abundant circumstantial evidence against Appellant, viewed in the light most favorable to the verdict, we hold that sufficient evidence exists to support Appellant's murder conviction. We overrule Appellant's first issue on appeal.

Appellant also claims that the evidence is insufficient to support his convictions for witness tampering. A person commits the offense of tampering with a witness if, "with intent to influence the witness, he offers, confers, or agrees to confer any benefit on a witness or prospective witness in an official proceeding . . . (3) to elude legal process summoning him to testify or supply evidence [or] (4) to absent himself from an official proceeding to which he has been legally summoned." PENAL § 36.05(a)(3), (4) (West 2016). The jury convicted Appellant under both of these theories of tampering: that he offered Montez a benefit to (1) avoid a subpoena and (2) ignore an existing subpoena. The Penal Code defines "benefit" as "anything reasonably regarded as pecuniary gain or pecuniary advantage." *Id.* § 36.01(3). The purpose of the statute "has been interpreted broadly to prohibit corruption of the judicial process." *Arnold v. State*, 68 S.W.3d 93, 98 (Tex. App.—Dallas 2001, pet. ref'd).

Appellant argues that, although he offered to pay the fine for Montez should she ignore the subpoena, payment of a fine does not confer a benefit because she will not experience a net gain. We disagree. The statute broadly defines benefit as anything that provides pecuniary, or monetary, gain or advantage. The offer to pay a fine falls squarely within the plain meaning of the language of the statute. *See Mosley v. State*, 983 S.W.2d 249, 256 (Tex. Crim. App. 1998) (stating that courts interpret statutes by giving words their plain meaning).

19

Here, the State produced evidence that Appellant offered to "take care of" potential fines for Montez if she avoided future summonses or failed to appear in response to a served summons. Montez testified that she understood "take care of" to mean that Appellant would pay fines for her. Appellant also offered Montez a place to stay with the mother of one of his children to avoid a subpoena. Although the address of the house was not recorded in the call, Montez testified that she and Appellant talked about her relocating and other ways to avoid future subpoenas. She said that the recorded call was the only time that they had ever made concrete plans. Because Montez also testified that she was in between housing and needed a place to stay, a jury could have reasonably concluded that the offer to find Montez a place to stay so that she could avoid a future subpoena would confer a benefit or advantage. Accordingly, we find that sufficient evidence exists for Appellant's witness-tampering convictions. We overrule Appellant's second issue on appeal.

In Appellant's third issue, he argues that the trial court erred when it denied his request for a hearing on his motion for new trial. However, the parties dispute whether Appellant requested a hearing, thereby preserving the error for our review. Appellant contends that he timely filed a motion for new trial and properly presented a proposed order in which he requested a hearing. The State argues that, because Appellant did not request a hearing in his motion for new trial, the proposed order filed on November 27, 2018, in which Appellant did request a hearing, was an untimely amendment that was not properly presented to the trial court. We agree with the State that Appellant failed to preserve the issue for review.

A defendant may file a motion for new trial no later than thirty days after the trial court imposes sentence in open court. TEX. R. APP. P. 21.4(a). Here, the trial court imposed the sentences on October 23, 2018, and Appellant's 30-day window closed on November 22, 2018. However, in 2018, the Thanksgiving holiday occurred on November 22 and 23, which extended the window for timely filing to

20

Monday, November 26.  *See* TEX. GOV'T CODE ANN. § 662.003(a)(8), (b)(6) (West 2012) (listing Thanksgiving Day and the following Friday as holidays).  Therefore, Appellant timely filed his motion for new trial on November 26, 2018.

A motion for new trial must be "presented" to the trial court within ten days of being filed.  TEX. R. APP. P. 21.6.  The purpose of presentment is to put the trial court on actual notice that the moving party desires "the judge to take some action, such as making a ruling or holding a hearing, on his motion for new trial." *Gardner v. State*, 306 S.W.3d 274, 305 (Tex. Crim. App. 2009).  The movant has the burden of presentment, which "must be apparent from the record." *Id.*; *see also Carranza v. State*, 960 S.W.2d 76, 79 (Tex. Crim. App. 1998).

The movant can show presentment with "the judge's signature or notation on the motion or proposed order, or an entry on the docket sheet showing presentment or setting a hearing date." *Gardner*, 306 S.W.3d at 305.  Although presentment can be shown in many ways, counsel's statement that a motion was presented is not sufficient to show that the trial court had actual notice of the request for a hearing. *Rodriguez v. State*, 425 S.W.3d 655, 663 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Bearnth v. State*, 361 S.W.3d 135, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("We cannot conclude that the presentment requirement was satisfied where the record shows only defense counsel's statement that the motion had been presented, but does not indicate that counsel in fact communicated the request for a hearing in a timely manner to a person capable of acting on it."). Likewise, an uncorroborated affidavit by defense counsel in which counsel states that counsel discussed a motion or request for a hearing with the trial court is insufficient to show presentment absent other evidence in the record.  *See Perez v. State*, 429 S.W.3d 639, 644 (Tex. Crim. App. 2014).  The record must contain some evidence that the defendant or his counsel took "steps to obtain a setting or attempted to get a ruling on a request for a hearing." *Id.*

Appellant argues that the "Certificate of Presentment" (Certificate) filed by Appellant's counsel shows that the request for a hearing was timely presented to the trial court. However, the Certificate states that the proposed order, in which Appellant requested a hearing, was filed with the trial court on November 27, 2018. The Certificate further contains a statement that counsel "informed" the trial court that Appellant "desired a hearing." Even assuming for the sake of argument that the conversation counsel refers to took place, the conversation did not take place on the record, and uncorroborated affidavits by counsel are insufficient to show presentment. Likewise, the docket sheet does not contain any notations or settings after the final day of trial. Therefore, we cannot say on this record that Appellant met his burden to present his request for a hearing on the motion for new trial.

Because Appellant did not give the trial court actual notice of his desire for a hearing on the motion, he failed to preserve his complaint for review. As such, we do not reach the question of whether the trial court abused its discretion when it did not hold a hearing on Appellant's motion for new trial. We overrule Appellant's third issue on appeal.

In Appellant's fourth issue on appeal, he argues that the trial court erred when it admitted, over a Rule 504 spousal privilege objection, recorded conversations between himself and his wife. *See* TEX. R. EVID. 504. A spouse who is incarcerated, Appellant argues, has "no choice but to communicate via monitored communications, and so the privilege should apply." However, Appellant does not cite, and we have not found, any authority to support that proposition.

We review a trial court's decision to admit evidence under an abuse of discretion standard. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006); *Walker v. State*, 406 S.W.3d 590, 593 (Tex. App.—Eastland 2013, pet. ref'd). A court abuses its discretion if its decision lies outside the zone of reasonable disagreement. *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992). We

22

disregard nonconstitutional errors that do not affect substantial rights. TEX. R. APP. P. 44.2(b). A substantial right is affected when the error has a substantial effect or influence on the jury's verdict. *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007).

Rule 504 of the Texas Rules of Evidence provides married persons with the privilege to refuse to disclose, and to prevent disclosure of, a "confidential communication" made to the person's spouse while they were married. TEX. R. EVID. 504(a)(2). The rule further defines "confidential" communication as a communication made "privately to the person's spouse" that is "not intend[ed for] disclosure to any other person." *Id.* 504(a)(1).

"The United States Supreme Court has held 'that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell.'" *State v. Scheineman*, 77 S.W.3d 810, 812 (Tex. Crim. App. 2002) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)). Although the Texas Court of Criminal Appeals has not addressed spousal privilege in this context, the court has addressed whether a person has a right to privacy, or a reasonable expectation of privacy, while incarcerated. In *Scheineman*, the court considered whether a prisoner had an expectation of privacy in relation to a conversation that he had with his codefendant while incarcerated. One of the factors that the court considered was the absence of "oral assurances of privacy." *Id.* at 813. Ultimately, the court found that the "[l]oss of privacy is an inherent incident of confinement." *Id.* (citing *Hudson*, 468 U.S. at 528).

Although Appellant claims that he had a subjective expectation of privacy because of his spousal relationship, he had no reasonable expectation of privacy. Appellant made more than 5,000 calls during his incarceration before trial. At trial, Appellant testified that he was aware of the preamble on all outgoing jail calls in which it was stated that all calls are subject to monitoring and recording. Therefore,

Appellant could not have reasonably expected that his conversations were made "privately" to his spouse as required under Rule 504(a)(1), (2). Appellant's argument that his only option to communicate with his spouse is equally unavailing in light of the inherent loss of privacy associated with confinement. Because we find that the recorded conversations were not private, and therefore not privileged, the trial court did not abuse its discretion when it admitted the recordings. We overrule Appellant's fourth issue on appeal.

We affirm the judgments of the trial court.

JIM R. WRIGHT
SENIOR CHIEF JUSTICE

January 14, 2021

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Wright, S.C.J.[1]

Williams, J., not participating.

---

[1]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.